UNITED STATES, for Use of CHOCTAW AND CHICKASAW NATIONS, v. McMURRAY et al.

(Circuit Court, E. D. Oklahoma. June 6, 1910.)

No. 605.

1. INDIANS (§ 16*)—LEASES OF COAL LANDS—VALIDITY OF REGULATIONS MADE BY SECRETARY OF THE INTERIOR.

Act June 28, 1898, c. 517, § 29, 30 Stat. 505, ratifying a previous agreement made with the Choctaw and Chickasaw Tribes of Indians April 23, 1897, provided, inter alia, that the coal lands of the tribes should be under the control and supervision of two trustees, who should perform their duties under rules prescribed by the Secretary of the Interior; that each lease should include 960 acres and be for a term of 30 years; that royalty should be paid on all coal produced by the lessees at the rate of 15 cents per ton, with power in the Secretary to reduce or advance such royalty where deemed to the best interest of the Indians; that on each lease there should be paid annually in advance $100 for each of the first

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

two years, $200 for the third and fourth years, and $500 for the fifth and each following year, to be treated as advance royalty and credited on royalties when the mine was developed, and that, on default in any such payment for 60 days, the lease should become null and void, and the payments made should be the property of the Indians. On May 22, 1900, and December 6, 1907, the Secretary promulgated amended regulations requiring lessees to mine on each lease 3,000 tons the first year, 4,000 tons the second, 7,000 tons the third, 8,000 tons the fourth, and 15,000 tons the fifth and each succeeding year, or pay the royalties on such quantities if not mined, and prescribing that a failure to do so would subject the lease to cancellation. *Held*, that the Secretary had no power to so add to the specific requirements of the act, which act of his was not a regulation, but in effect an amendment of the statute, and that an action could not be maintained against a lessee to enforce payment of royalties so unlawfully imposed.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 16.*]

2. INDIANS (§ 16*)—LEASES OF COAL LANDS—VALIDITY OF REGULATIONS MADE BY SECRETARY OF THE INTERIOR.

While such act by implication probably authorized the trustees for the Indians to insert in a lease the usual provision requiring diligehce in the prospecting and mining operations, such a provision conferred no authority on the Secretary to arbitrarily determine by a regulation such as that promulgated what would constitute reasonable diligence which could only be determined by a court on consideration of the facts and circumstances of the particular case.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 16.*]

Action by the United States, for the use of the Choctaw and Chickasaw Nations, against John F. McMurray, James M. Lindsay, Fisher A. Tyler, Jr., and John L. Simpson. On demurrer to complaint. Demurrer sustained.

Wm. J. Gregg, U. S. Dist. Atty.

A. A. Richards, for defendants.

CAMPBELL, District Judge. In Act Cong. June 28, 1898, c. 517, 30 Stat. 495, entitled "An act for the protection of the people of Indian Territory and for other purposes," there was incorporated the agreement made by the Commission to the Five Civilized Tribes with commissioners representing the Choctaw and Chickasaw Tribes of Indians on the 23d day of April, 1897. This agreement was ratified and confirmed by this act, and, subject to its subsequent ratification by the tribes, was to be in full force and effect. It was subsequently ratified by the tribes, as provided for in the act. The act provided (section 29) that, when ratified, the other provisions of the act should only apply to said tribes "where the same do not conflict with the provisions of said agreement" (except as to section 14 of the act, which relates to city and town governments).

With regard to the coal and asphalt lands of the Choctaw and Chickasaw Nations, this agreement provided:

"It is agreed that all the coal and asphalt within the limits of the Choctaw and Chickasaw Nations shall remain and be the common property of the members of the Choctaw and Chickasaw Tribes (freedmen excepted), so that each and every member shall have an equal and undivided interest in the whole, and no patent provided for in this agreement shall convey any title thereto. The revenues from coal and asphalt, or so much as shall be neces-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sary, shall be used for the education of the children of Indian blood of the members of said tribes. Such coal and asphalt mines as are now in operation, and all others which may hereafter be leased and operated, shall be under the supervision and control of two trustees, who shall be appointed by the President of the United States, one on the recommendation of the principal chief of the Choctaw Nation, who shall be a Choctaw by blood, whose term shall be for four years, and one on the recommendation of the governor of the Chickasaw Nation, who shall be a Chickasaw by blood, whose term shall be for two years, after which the term of appointees shall be four years. Said trustees, or either of them, may at any time be removed by the President of the United States for good cause shown. They shall each give bond for the faithful performance of their duties, under such rules as may be prescribed by the Secretary of the Interior. Their salaries shall be fixed and paid by their respective nations, each of whom shall make full report of all his acts to the Secretary of the Interior quarterly. All such acts shall be subject to the approval of said Secretary. All coal and asphalt mines in the two nations, whether now developed or to be hereafter developed, shall be operated, and the royalties therefrom paid into the Treasury of the United States, and shall be drawn therefrom under such rules and regulations as shall be prescribed by the Secretary of the Interior. All contracts made by the national agents of the Choctaw and Chickasaw Nations for operating coal and asphalt with any person or corporation which were, on April twenty-third, eighteen hundred and ninety-seven, being operated in good faith, are hereby ratified and confirmed, and the lessee shall have the right to renew the same when they expire, subject to all the provisions of this act. All agreements heretofore made by any person or corporation with any member or members of the Choctaw or Chickasaw Nations, the object of which was to obtain such member or members permission to operate coal or asphalt, are hereby declared void: Provided, that nothing herein contained shall impair the rights of any holder or owner of a leasehold interest in any oil, coal rights, asphalt, or mineral which have been assented to by act of Congress, but all such interests shall continue unimpaired hereby, and shall be assured by new leases from such trustees of coal or asphalt claims described therein by application to the trustees within six months after the ratification of this agreement, subject, however, to payment of advance royalties herein provided for. All leases under this agreement shall include the coal or asphaltum or other mineral, as the case may be, in or under nine hundred and sixty acres, which shall be in a square as nearly as possible and shall be for thirty years. The royalty on coal shall be fifteen cents per ton of two thousand pounds on all coal mined, payable on the 25th day of the month next succeeding that in which it is mined. Royalty on asphalt shall be sixty cents per ton, payable same as coal: Provided, that the Secretary of the Interior may reduce or advance royalties on coal and asphalt when he deems it for the best interests of the Choctaws and Chickasaws to do so. No royalties shall be paid except into the United States Treasury, as herein provided. All lessees shall pay on each coal or asphalt claim at the rate of one hundred dollars per annum, in advance, for the first and second years; two hundred dollars per annum, in advance, for the third and fourth years; and five hundred dollars for each succeeding year thereafter. All such payments shall be treated as advanced royalty on the mine or claim on which they are made and shall be a credit as royalty when each said mine is developed and operated and its production is in excess of such guaranteed annual advance payments; and all persons having coal leases must pay said annual advanced payments on each claim whether developed or undeveloped: Provided, however, that should any lessee neglect or refuse to pay such advanced annual royalty for the period of sixty days after the same becomes due and payable on any lease, the lease on which default is made shall become null and void, and the royalties paid in advance thereon shall then become and be the money and property of the Choctaw and Chickasaw Nations."

Pursuant to the terms of the act, and prior to the date of the leases hereinafter referred to, the Secretary of the Interior promulgated cer-

tain rules and regulations relative to coal and asphalt leases and the operation of mines thereunder, wherein it was provided:

"That all lessees shall be required to pay advanced royalties, as provided in said agreement, on all mines or claims, whether developed or not, to be 'a credit on royalties when each said mine is developed and operated and its production is in excess of such guaranteed annual advanced payments,' as follows, viz.: One hundred dollars per annum in advance for the first and second years, two hundred dollars per annum in advance for the third and fourth years, and five hundred dollars in advance for each succeeding year thereafter; and that, should any lessee neglect or refuse to pay such advanced royalty for the period of sixty days after the same becomes due and payable on any lease, the lease on which said default is made shall become null and void, and all royalties paid in advance shall be forfeited and become the money and property of the Choctaw and Chickasaw Nations."

On March 15, 1899, the defendant J. F. McMurray entered into four separate contracts of lease with Napoleon B. Ainsworth and Lemuel C. Burris, as mining trustees of the Choctaw and Chickasaw Nations of Indians, whereby said nations leased to the said McMurray for the term of 30 years four different tracts of land for the purposes of prospecting for and mining coal therefrom. The terms of the several leases were identical, except as to the description of the property leased. Each lease provided that McMurray should pay to the United States Indian agent, at Union Agency, Ind. T., the sum of 10 cents per ton for all coal produced from said leases passing over a one-inch screen. Each lease contains, among others, the following provisions:

"And the party of the second part further agrees and binds himself, his executors, administrators, and assigns, to pay or cause to be paid to the United States Indian agent for Union Agency, Indian Territory, as advanced royalties on each and every mine or claim within the tract of land covered by this lease, a sum of money as follows, to wit: One hundred dollars per annum in advance for the first and second years; two hundred dollars per annum in advance for the third and fourth years; and five hundred dollars per annum in advance for the fifth and each succeeding year thereafter of the term for which this lease is to run, it being understood and agreed that said sums of money to be paid as aforesaid shall be a credit on royalties should the party of the second part develop and operate a mine or mines on the lands leased by this indenture, and the production of such mine or mines exceeds such sum paid as advanced royalties as above set forth. * * *

"The party of the second part further covenants and agrees to exercise diligence in the conduct of the prospecting and mining operations and to open mines * * * and to operate the same in a workmanlike manner to the fullest possible extent on the above-described tract of land. * * *

"And the party of the second part agrees that this indenture of lease shall be subject in all respects to the rules and regulations heretofore or that may be hereafter prescribed under the said act of Congress of June 28, 1898, by the Secretary of the Interior relative to mineral leases in the Choctaw and Chickasaw Nations."

On May 22, 1900, after the execution and approval of the foregoing leases, the Secretary of the Interior promulgated amended rules and regulations relative to such coal leases, wherein there was added to the rule or regulation above quoted the following:

"All advanced royalties as above defined shall apply from date of approval of each lease, and, when any mine or tract leased is operated, royalty due shall be paid monthly as required until the total amount paid equals the first annual advanced payment, after which royalty due shall be credited on such payments; and the lessee shall operate and produce coal from each and every

lease in not less than the following quantities: Three thousand tons during the first year from date of approval of lease; four thousand tons during the second year; seven thousand tons the third year; eight thousand tons the fourth year, and fifteen thousand tons the fifth and each succeeding year thereafter."

On December 6, 1907, the Secretary again amended said rules and regulations as to the minimum amount of coal that must be produced each year to read as follows:

"Each lessee shall produce coal equal to the aggregate of three thousand tons for each lease held by him, during the first year from date of approval thereof; four thousand tons during the second year; seven thousand tons during the third year; eight thousand tons during the fourth year; and fifteen thousand tons the fifth and each succeeding year during the term of such lease, or pay royalty as if such amounts had been produced; provided, that any amount paid in excess of that required by actual production shall be held as a credit to be applied in payment of royalty on subsequent actual production, and a failure to meet this requirement will subject the lease or leases as to which default shall occur, to cancellation."

The United States, for the use of the Choctaw and Chickasaw Nations, has filed its complaint at law against McMurray and his bondsmen for the recovery of certain unpaid royalties claimed to be due the Choctaw and Chickasaw Nations, based upon the annual tonnage required to be produced by the foregoing regulations. The royalties claimed to be due on each lease are covered by a separate count in the complaint, and the following paragraph from one of the counts is typical of the claim made upon each lease:

"That under the provisions of the regulations of the Secretary of the Interior approved May 22, 1900, and December 6, 1907, and now in force and now a part of the original coal lease contract between the Choctaw and Chickasaw Nations and the said defendant, John F. McMurray, there has become and is now due to the Choctaw and Chickasaw Nations of Indians under said lease the sum of eight thousand eight hundred and twenty dollars ($8,-820.00), accruing as follows: $100 for the first year; $320 for the second year; $560 for the third year; $640 for the fourth year; and $1,200 per annum for each of the succeeding six years thereafter, making a total amount due of eight thousand eight hundred and twenty dollars ($8,820.00) less a credit of sixteen hundred dollars ($1,600.00) paid by the defendant, John F. McMurray, on account of advanced royalties on said lease, leaving a balance now due of seven thousand two hundred and twenty dollars ($7,220.00) as shown by an itemized statement of royalties due on lease No. 3 hereto attached, marked 'Exhibit B.' "

To this complaint the defendants have filed their demurrer, challenging the capacity of the complainant to sue, asserting that there is a defect of parties plaintiff, and that the complaint does not state facts sufficient to constitute a cause of action against the defendant. As the demurrer must be sustained upon the last-mentioned ground, it will not be necessary to pass upon the other questions.

The leases as originally entered into, it will be noted, did not require that McMurray should actually produce any given amount of coal in any one year. The only requirement relating to the activity he should exercise in developing a mine was his agreement to "exercise diligence in the conduct of the prospecting and mining operations and to open mines and to operate the same in a workmanlike manner, to the fullest possible extent." Should he violate this or any other stipulation

or agreement in the lease, it was provided that, in that event, the Secretary of the Interior should be at liberty in his discretion to avoid the lease and cause the same to be annulled. But such annulment for alleged failure to exercise diligence in development cannot be accomplished by mere fiat of the Secretary, especially if the lessee were resisting and denying the charge of lack of diligence. Under such circumstances, the forfeiture of these leases, like the forfeiture of any similar contract, could only be accomplished by proper court proceedings, and the question as to whether due diligence had been exercised would depend upon the facts and circumstances of the particular case and what could constitute due diligence as to one lease might fall far short of that as to another lease differently situated.

Now, turning to the act from which these leases derive their authority for existence, we find Congress has made definite provision with regard to certain essentials. The coal lands shall be under the supervision and control of two mining trustees. The leases shall each contain 960 acres, in as nearly a square form as possible, and shall extend for a period of 30 years. The royalty shall be 15 cents per ton, and shall be payable on a certain date fixed by the act, but the Secretary may reduce or advance royalties when he may deem it to the best interest of the Indians to do so. On each lease, whether developed or not, the lessee must pay $100 the first and second year; $200 the third and fourth years, and $500 for each succeeding year thereafter, which payments are to be treated as a credit upon the royalty when the mine shall become a producer; "provided, however, that should any lessee neglect or refuse to pay such advance annual royalty for the period of sixty days after the same becomes due and payable on any lease, the lease on which default is made shall become null and void, and the royalty paid in advance thereon shall then become and be the money and property of the Choctaw and Chickasaw Nations." It will hardly be contended that the Secretary could by any rule or regulation change any of the above positive provisions of the law, except the royalty per ton, which he is specifically authorized to change under stated conditions. Certainly the power to make such change would not be conceded to the Secretary except by language in the act clearly conferring such power, and the fact that Congress has lodged in the Secretary the power to change the amount of royalty emphasizes the intention of Congress by its silence as to conferring the power to change any other feature of the act to withhold such power from him. The leases made pursuant to this act have embodied in them the foregoing provisions. It was contemplated by Congress that there would be in some instances at least a considerable time elapse between the execution and approval of the leases and actual development and production. It might be five years, or even longer. In order to secure to the tribes in the meantime some revenue from the land, and probably to incite more speedy development, Congress provided these advance royalties, and determined that the amounts fixed should be compensation the lessee should pay the tribes pending the opening of producing mines. While nothing is said in the act about the diligence the lessee shall exercise in development, I think it may be assumed that Congress in granting the authority to the mining trustees

to make leases contemplated that one of the terms thereof should be the requirement of due diligence in development, a provision universally incorporated in such leases. And I think that provision is properly in the leases under consideration. So that a lessee cannot excuse an unconscionable delay by relying upon the fact that he had paid the advance royalties provided by the act, but, as said before, the question as to whether due diligence has been exercised in a controverted case is for the courts. But the act does provide that the mines shall be operated and the royalties therefrom paid into the Treasury of the United States, and drawn therefrom under such rules and regulations as shall be prescribed by the Secretary of the Interior, and the lessee McMurray agrees in his leases that the lease "shall be subject in all respects to the rules and regulations heretofore or that may hereafter be prescribed under said act * * * by the Secretary of the Interior."

The complainant insists that the regulation promulgated by the Secretary after the execution of the lease, which imposes upon the lessee the duty of mining a fixed amount of coal the first and each succeeding year, is authorized by the provision of the act empowering the Secretary to prescribe rules and regulations for the operation of the mine, and is agreed to by McMurray in the lease. The defendants, on the other hand, contend that it is not a mere rule or regulation, such as the act and the lease contemplate, but is an unwarranted attempt to change the terms of the lease, and the imposition upon McMurray of an additional burden not contemplated by the law or the lease, and outside the Secretary's power to make rules and regulations.

In the case of Midland Oil Co. et al. v. Susan Turner et al. (decided by the Circuit Court of Appeals for this Circuit on April 11, 1910) 179 Fed. 74, the question of the Secretary's power to change by rule or regulation the terms of an existing lease was involved. Individual citizens of the Cherokee Nation were by act of Congress authorized to lease their allotments for mineral and oil purposes, subject to the Secretary's approval and under rules and regulations to be prescribed by him. Susan Turner, by her guardian, executed to the Midland Oil Company an oil lease upon her allotment upon a form prescribed by the Secretary of the Interior, providing, among other things, that it should not be assigned without the written consent of the lessor. Subsequently the Secretary promulgated a regulation providing for assignment of such leases upon consent of the Secretary of the Interior. The Midland Company, without the consent of the lessor, executed a written assignment of the lease to a third party, which assignment was approved by the Assistant Secretary of the Interior acting for the Secretary. As to the validity of this assignment, the court say:

"The assignment of the lease was contrary to the express prohibition contained in it and was void. It conferred no rights whatever on the assignees. We assume without further consideration that the approval of the assignment by the Assistant Secretary of the Interior had the same effect as if done by the Secretary himself. But that does not help matters. The power of the Secretary with respect to oil and gas leases of Cherokee allottees was that of approval or disapproval. He could veto, but could not initiate or make, a lease. He might refuse to approve because of the presence of a provision and

thereby render the lease ineffective, but he could not strike out a part and have the remainder continue in force without the concurrence of the lessor. If a lease were made to A. with a prohibition against transfer, the Secretary could not lawfully nullify the prohibition by approving a transfer to B. The land, subject to specific restrictions imposed by Congress, belonged to the Indian, and whether a lease should be made at all, and, if so, upon what terms, rested in the first place with the guardian and the court of probate."

The extent to which departmental rules and regulations may go is clearly defined in Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267, a leading case and since followed in numerous decisions. The reporter briefly states the case as follows:

"Section 2505 of the Revised Statutes provides, among other things, that 'animals, alive, specially imported for breeding purposes from beyond the seas, shall be admitted free (of duty), upon proof thereof satisfactory to the Secretary of the Treasury, and under such regulations as he may prescribe.' Article 383 of the Treasury Customs Regulations provides that before a collector admits such animals free he must, among other things, 'be satisfied that the animals are of superior stock, adapted to improving the breed in the United States.' Jones imported certain animals, which were entered at the port of Portland, Me., and he claimed that they should be admitted free, as they were 'specially imported for breeding purposes.' Morrill, the collector, though the importation was for breeding purposes, demanded the duties because he was not satisfied that the animals were of 'superior stock.' The duties were accordingly paid under protest, and this suit was brought to recover the amount so paid."

Jones recovered a judgment against the collector for the duties paid, and, in affirming this judgment, Chief Justice Waite said:

"The Secretary of the Treasury cannot by his regulations alter or amend a revenue law. All he can do is to regulate the mode of proceeding to carry into effect what Congress has enacted. In the present case we are entirely satisfied the regulation acted upon by the collector was in excess of the power of the Secretary. The statute clearly includes animals of all classes. The regulation seeks to confine its operation to animals of 'superior stock.' This is manifestly an attempt to put into the body of the statute a limitation which Congress did not think it necessary to prescribe. Congress was willing to admit duty free all animals specially imported for breeding purposes. The Secretary thought this privilege should be confined to such animals as were adapted to the improvement of breeds already in the United States. In our opinion the object of the Secretary could only be accomplished by an amendment of the law. This is not the office of a treasury regulation."

Is not the present case an attempt to put in the body of the statute a limitation or provision which Congress did not think it necessary to prescribe? Congress has said that the mining trustees and the lessee might enter into a lease-contract covering 960 acres to extend for 30 years at a royalty per ton which the Secretary was authorized to change, with the provision that, until actual operation and mining which would result in an output royalty, the lessee should pay an annual advance royalty of certain sums fixed by the act, and inferentially, I think, authorizing a provision in the lease for diligent operation. The leases in question were drawn pursuant to and contained all these provisions. It is not contended that McMurray has not paid the advance annual royalties. In fact, the complaint alleges that he has paid a considerable portion of them, and it is allowed as a credit. It is not contended that McMurray has not under the circumstances exercised diligence in development of them. The lapse of time since the

execution of the leases might strongly support such a contention, but the penalty for negligence in that respect fixed by the lease is its forfeiture, which, as we have said, in a controverted case, is a question to be finally determined by the courts, and not by the Secretary. But the Secretary by the regulation challenged has fixed the measure of diligent operation at 3,000 tons during the first year, 4,000 tons during the second year, 7,000 tons during the third year, 8,000 tons during the fourth year, and 15,000 tons during the fifth and each succeeding year, and this to apply to any and all leases, regardless of the varying circumstances attendant upon different leases arising from natural and artificial conditions. If he may arbitrarily fix this tonnage, why may he not fix any tonnage, even that which would be prohibitive of operation, and thus defeat the very object of the act itself? Such a power will not be presumed to exist except it be clearly granted. Congress did grant him the power to change the per ton output royalty to such extent as he might deem to the best interests of the tribes. If it had intended that he might also arbitrarily fix the minimum amount of coal to be mined, regardless of existing conditions, that too could and should have been clearly granted, and the fact that it was not persuades me that it was not intended, especially when it is considered that Congress contemplating more or less delay in beginning operations provided for stipulated advance royalties pending such delay.

I consider the regulation unauthorized, and the demurrer will be sustained. It is so ordered.