## UNITED STATES v. MISSOURI–KANSAS–TEXAS R. CO. et al.

### No. 795.

Circuit Court of Appeals, Tenth Circuit.

Sept. 7, 1933.

Grady Lewis, Choctaw National Atty. and Sp. Asst. to Atty. Gen. (W. F. Rampendahl, U. S. Atty., of Muskogee, Okl., on the brief), for the United States.

M. D. Green, of Muskogee, Okl. (Eric Haase, of Muskogee, Okl., on the brief), for appellee Missouri-Kansas-Texas R. Co.

B. Broaddus, of Muskogee, Okl. (N. A. Gibson and T. L. Gibson, both of Tulsa, Okl., on the brief), for appellee United States Fidelity & Guaranty Co.

Before LEWIS and PHILLIPS, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge.

The decree in this case dismissed appellant's bill on final hearing. Appellees, defendants below, are the Missouri-Kansas-Texas Railroad Company, a Missouri corporation, sued as successor of the Missouri, Kansas & Texas Railway Company, a Kansas corporation, and two surety companies.

The relief sought was an accounting and the enforcement of a claimed lien for alleged unpaid royalties under a coal mining lease that had been given on March 20, 1902, to Southwestern Coal and Improvement Company, a West Virginia corporation, on segregated lands of the Choctaw and Chickasaw Nations pursuant to the provisions of section 29 of the Act of June 28, 1898, 30 Stat. 495, 505. The lease was executed by both parties, on the part of the two nations by Ainsworth and Carter as their mining trustees. It recited that it was made pursuant to the provisions of said Act of June 28, 1898, the agreement set out in section 29 thereof, "and the rules and regulations prescribed by the Secretary of the Interior on May 22, 1900, relative to mining leases in the Choctaw and Chickasaw Nations." In addition to the provisions inserted in said lease as required by the Act of June 28, 1898, as to which there is no controversy, it also contained the substance. of one of the Secretary's rules and regulations made by him on May 22, 1900, to-wit:

"And the party of the second part agrees and binds itself and its successors or assigns to operate and produce coal from each and every lease of not less than the following quantities: Three thousand tons during the first year from the date of approval of lease; four thousand tons the second year; seven thousand tons the third year; eight thousand tons the fourth year; and fifteen thousand tons the fifth and each succeeding year thereafter. * * *"

It also provided in terms, that the lease should be subject in all respects to the rules and regulations that had theretofore been adopted by him. The lease sued on is referred to as lease No. 6. No coal was produced under it and no effort was ever made to cancel or avoid it. Five other leases on other segregated lands of the two nations were made and entered into between the same parties on March 20, 1902, each containing the same terms and provisions as this lease. The subsequent regulation was adopted on December 6, 1907, by the Secretary, and reads in this way:

"Each lessee shall produce coal equal to the aggregate of three thousand tons for each lease held by him during the first year from date of approval thereof; four thousand tons during the second year; seven thousand tons during the third year; eight thousand tons during the fourth year; and fifteen thousand tons the fifth and each succeeding year during the term of such lease, or pay royalties as if such amounts had been produced; provided, that any amount paid in excess of that required by actual production shall be held as a credit to be applied in payment of royalties on subsequent actual production, and a failure to meet this requirement will subject the lease or leases, as to which default shall occur, to cancellation."

The lessee with the approval of the Secretary of date August 12, 1902, assigned all six leases to the Southwestern Development Company, and that company with the approval of the Secretary of date February 18, 1908, assigned them to Robert W. Maguire. The instrument of assignment executed by the Southwestern Development Company bears date April 9, 1906, but its acceptance by Maguire was in writing of date November 11, 1907, and it recited that his acceptance was subject to the approval and consent of the Secretary, and that Maguire's acceptance was not to be effective until the assignment was approved by the Secretary. Maguire gave bond with appellee National Surety Company as surety, conditioned that he would carry out and observe the obligations assumed by him in the six leases, which was also approved by the Secretary on February 18, 1908. Maguire later assigned the six leases with the approval of the Secretary to George T. Cutts, who also gave bond with the United States Fidelity and Guaranty Company as his surety, conditioned that he would carry out the obligations assumed by him in the six leases, and that bond was approved August 11, 1920, by the Secretary. Maguire and Cutts were in the employ of the Missouri, Kansas and Texas Railway Company, a Kansas corporation, and it is agreed that each held the leases as trustee for the railway company.

Clearly the amended regulation took the place of the prior regulation of May 22, 1900, the substance of the latter being embodied in the lease as quoted supra. But had it not been embodied, the lease by reference drew into it all regulations, then and thereafter adopted. Both of these regulations were challenged as invalid in suits instituted in the Circuit Court for the Eastern District of Oklahoma. That court held them void. One of them is reported under title United States ex rel. v. McMurray, 181 F. 723. The other is unpublished, but the opinion is set forth in this record. It is entitled United States v. Degnan & McConnell Coal & Coke Company, et al. The first one was decided on June 6, 1910, and the last one on September 21, 1915. These decisions were accepted by the

departments. In fact after the last decision the question of appeal was submitted to the Attorney General. He reported to the Secretary of the Interior that after careful consideration he believed the case too weak to promise any chance of success in the appellate court. The first regulation seems to have been wholly abandoned, and no demand on lessees was thereafter made under the second. Nevertheless some lessees tendered payment under the second, and the tenders were accepted.

In as much as all interested parties accepted the decisions of the Federal court for the Eastern District of Oklahoma and thereafter for many years proceeded in the execution of their contract in accord with those decisions, we do not think it a vital point in disposing of this case that the question of the Secretary's power or lack of power to establish and enforce either regulation be now passed on. We say this because on the facts hereinafter stated it is our opinion that there was full substantial performance, even if the lessee was bound by the regulations. However, it is our belief that the Secretary exceeded his power in both regulations, that each operated as an amendment of a substantial part of section 29, which prescribed what should be done annually as to each lease that did not produce to save it in full force to the lessee. The regulations each added different and greater requirements for that purpose.

It was the purpose of section 29 of the Act of June 28, 1898, to protect the rights of lessees of tribal coal lands that had accrued under prior contracts with the Choctaw and Chickasaws. It gave to such lessees the right to have their leases renewed for terms of thirty years. It provided for payment of royalties on the coal mined. It prescribed the number of acres to be included in each lease. It contains this paragraph:

"All lessees shall pay on each coal or asphalt claim at the rate of one hundred dollars per annum, in advance, for the first and second years; two hundred dollars per annum, in advance, for the third and fourth years; and five hundred dollars for each succeeding year thereafter. All such payments shall be treated as advanced royalty on the mine or claim on which they are made, and shall be a credit as royalty when each said mine is developed and operated, and its production is in excess of such guaranteed annual advance payments, and all persons having coal leases must pay said annual advanced payments on each claim whether developed or undeveloped: Provided, however, That should any lessee neglect or refuse to pay such advanced annual royalty for the period of sixty days after the same becomes due and payable on any lease, the lease on which default is made shall become null and void, and the royalties paid in advance thereon shall then become and be the money and property of the Choctaw and Chickasaw nations."

It is observed that these advance annual payments were to be made on each mine or claim whether developed or undeveloped, and if made the payments discharged the full obligations of the lessee for that year on all claims that were not developed and operated during that year, and if so developed and operated those payments were credited on the royalties on coal produced from each developed and operated claim, if the royalties were in excess of such advance payment. A penalty was fixed for failure to make those advance payments. The leases on such claims on which such payments had not been made, if any, became null and void. But the Secretary in each of his regulations, the original and amended, undertook to enlarge that obligation. He required that every lease should be operated and made to produce coal every year in specified minimum tonnage.

The leases provided that the annual advance payments of $100 per year the first two years, etc., required by said section 29 and the royalties on coal produced at the rate of eight cents per ton should be paid to the United States Indian agent for the Union Agency, Indian Territory. After the decisions in the McMurray Case (181 F. 723) and the Degnan & McConnell Coal & Coke Company Case, there was extended correspondence between the Superintendent of the Five Civilized Tribes, the Commissioner to those tribes and the Union Agency, and the Secretary of the Interior and the Commissioner of Indian affairs, and with some of the lessees, as to what, if anything, should or could be exacted of them under said two regulations. Much, if not all, of that correspondence was identified by the senior clerk in the office of the Superintendent of the Five Civilized Tribes, and introduced in evidence. He testified that the Secretary of the Interior advised that the minimum tonnage originally in the leases be disregarded; that no attempt was made to enforce the minimum tonnage provisions as to any lessee, but there were some companies which voluntarily paid it, and after it was voluntarily paid the money was not returned but credited to the lessee's account;

that the Secretary directed them to take all the leases together and the production upon one lease, if it was sufficient to meet the requirements of the other leases, the minimum requirements, if the lessee had more than one lease and mined enough on one lease, but nothing on the other leases, to equal the minimum tonnage on each of the different leases, that that was a compliance with the regulations; that the railway and railroad companies voluntarily paid the deficient royalties for all of the leases and paid (on) the minimum tonnage for a number of years, paid their requirements. He testified that if a lessee paid $1,200 as royalty on a lease that was not operated and producing (eight cents per ton on 15,000 tons exacted by the Secretary's regulations of December 6, 1907) they entered $500 under the advance royalty column and the $700 in the deficient royalty column. It will be observed that the second regulation provided that any amount paid in excess of that required by actual production shall be held as a credit to be applied in payment of royalty on subsequent actual production. He testified that the lessee voluntarily paid the $700 in some instances; that he did not exact it, and they were advised not to do so; that they regarded the leases as being paid up. In June, 1912, the Commissioner of Indian affairs said in a letter to the Secretary of the Interior relative to the railway company's six leases: "All amounts due under the leases have been paid." The auditor of the railroad company testified that the total production from the leases assigned to the railway company during the thirty years was more than twice the tonnage that would have been produced from them if only the minimum required by the Secretary's regulations had been produced from each lease, and in consequence more than twice the amounts in royalties were paid than would have been paid if only the said minimum had been mined. He further testified that at the expiration of these six leases on March 20, 1932, there was still approximately $29,000 of advance royalties which had been paid into the Indian agent to the credit of the tribes and unused, and that the Indian office figures show the same thing. Monthly settlements were made between the lessees and the Indian Agency. The amount of production for each month was stated in a report under oath, and if differences arose they were at once adjusted. These reports or copies were sent regularly to the Secretary and adjustments had his approval.

Other matters are brought into the record and are discussed,—the receivership of the railway company, extending from September, 1915, into 1923, during which all of the properties of the railway company including its interest in these leases was sold under the usual decree and orders and thereafter conveyed to the railroad company, a Missouri corporation. The lease here sued on was assigned by the purchasers to the railroad company in April, 1924. The other five a few months earlier. Appellant's counsel contend that even though the new railroad company was in no way liable until this lease was assigned to it that the liability of the sureties of the old company continued. During receivership the receiver operated the road and produced coal under the leases and paid the royalties. During Federal control, which covered a part of the time when the old company was in receivership, the Director General paid the royalties. The production and royalties paid by each of them are included in the estimates given by the auditor of the road supra. We see no occasion to give further consideration to those subjects.

The contentions of appellant all go back to and are based upon the admitted fact that no coal was produced under lease No. 6, and thereon counsel seek to apply literally the Secretary's regulations. It would have availed the lessors nothing if the lessee had produced 15,000 tons less each year from the five leases and taken an equal tonnage from lease No. 6. The most that can be claimed for either regulation is that it was a precautionary measure to insure diligence, and if they be accepted as valid for that purpose, their requirements beneficial to the lessors were far exceeded. On the facts it is our opinion there is no merit or equity in appellant's case. The lessors have received all if not more than they were entitled to under the lease.

Decree affirmed.