JICARILLA APACHE TRIBE, Plaintiff,

v.

Cecil D. ANDRUS, et al., Defendants.

No. CIV–76–588 C.

United States District Court,
D. New Mexico.

Feb. 12, 1980.

On Counterclaims March 10, 1980.

John B. Rudolph, William W. Bedwell, Washington, D.C., Nordhaus, Haltom & Taylor, Albuquerque, N.M., for plaintiffs.

James B. Grant, Asst. U.S. Atty., Albuquerque, N.M., Herbert Pittle, Dept. of Justice, Washington, D.C., for Cecil D. Andrus.

Charles M. Darling, IV, Washington, D.C., Millard F. Carr, Denver, Colo., Jason W. Kellahin, Kellahin & Fox, Santa Fe, N.M., for Tenneco Oil Co.

E. William Cole, Jr., Washington, D.C., S.B. Christy, IV, Jennings, Christy & Copple, Roswell, N.M., for Union Oil Co. of California and Mesa Petroleum Co.

Jason Kellahin, Kellahin & Fox, Santa Fe, N.M., for Tesoro Petroleum Corp. and Nassau Resources, Inc.

Jenkens & Gilchrist, Dallas, Tex., for Kirby Exploration Co.

Jennings, Christy & Copple, S.B. Christy, IV, Roswell, N.M., Fulbright & Jaworski, M.W. Parse, Jr., Houston, Tex., for Delaware-Apache Corp.

Don M. Chrestman, Kenneth A. Swanson, Fort Worth, Tex., and John R. Cooney, Lynn Slade, Albuquerque, N.M., for Aztec Oil and Gas Co. and Southland Royalty Co.

Rex D. Throckmorton, Albuquerque, N.M., for Kirby Exploration Co.

Boesche, McDermott & Eskridge, Glenn R. Davis, Tulsa, Okl., McCormick, Paine & Forbes, Carlsbad, N.M., for Apexco, Inc.

Campbell, Bingaman & Black, Bruce D. Black, Santa Fe, N.M., for Gulf Oil Corp.

Tommy Roberts, Gen. Counsel, Farmington, N.M., for Dugan Production Corp.

Richard T.C. Tully, Farmington, N.M., for Benson-Montin & Greer Drilling and Marrion & Bayless Drilling Corp.

William V. Kastler, Houston, Tex., for Gulf Oil Co.

## MEMORANDUM OPINION

CAMPOS, District Judge.

### I. PRELIMINARY STATEMENT OF THE CASE.

Plaintiff Jicarilla Apache Tribe filed this suit on April 21, 1976, in the District Court for the District of Columbia, seeking cancellation of certain oil and gas leases on its Reservation. On September 21, 1976, an order was entered transferring the case to this District. It was assigned to another judge in this district and, on July 20, 1978, it was transferred to the present judge on the case.

Trial before the Court without a jury commenced on May 14, 1979, and continued for fourteen (14) trial days. Closing arguments were heard on June 25, 1979, following preparation of a partial trial transcript and submission of briefs and requested findings of fact and conclusions of law by the parties.

During the trial, the Court learned that the Defendant Secretary of the Interior was contemplating further action under the National Environmental Policy Act (NEPA) in relation to the subject matter of this case. Anticipating possible effects on the issues in the case, this Court awaited the further action of the Secretary of the Interior. That action came in January 1980.

Plaintiff is an Indian Tribe organized and incorporated under the laws of the United States, Act of June 18, 1934, Ch. 576, Sections 16, 17, 48 Stat. 487 *et seq.*, 25 U.S.C. Sections 476–477, and residing at the present time on an Executive Order Reservation in northern New Mexico. The original defendants were the Secretary of the Interior, then Thomas S. Kleppe, and two oil and gas companies, Tenneco Oil Co. and Union Oil Co. of California. The latter two held leasehold interests in tribal lands as the result of post-1970 sales of oil and gas leases. Following denial of a motion for class certification of Defendants, the rest of the lessee companies with an interest in the subject matter of the suit were added. The list of Defendants has undergone continuous change as those companies went out of business, merged, transferred their interests in the leases, etc.[1] Cecil D. Andrus was substituted for Kleppe by Order of March 4,

1. At trial, the industry defendants represented were: (1) Tesoro Petroleum Corp., (2) North American Exploration Co., (3) Nassau Re-

1977. Numerous pre-trial motions were disposed of along the way; the relevant ones will be discussed below.

The Tribe seeks cancellation of oil and gas leases on two theories: first, that the Secretary of the Interior violated certain federal regulations in advertising the sale of the leases resulting, the Tribe claims, in non-competitive bidding and lower bonus payments to the Tribe; and, second, that the Secretary violated NEPA by not preparing an environmental impact statement (EIS) before approving the oil and gas leases on the Tribe's lands. Involved are four (4) oil and gas lease sales of Jicarilla Apache Reservation land. These occurred on April 22, 1970, July 14, 1971, November 17, 1971, and September 6, 1972. Of a total 415,885.90 acres offered, 276,117.61 acres were actually leased.[2]

Jurisdiction is properly conferred upon this Court by 28 U.S.C. Section 1331, 5 U.S.C. Section 701 et seq., 28 U.S.C. Sections 1361 and 1362, 28 U.S.C. Sections 2201 and 2202, 25 U.S.C. Sections 396 and 398, and the regulations issued by the Secretary of the Interior pursuant thereto.

At trial, the defenses focused on by Defendants were lack of violation of regulations, lack of harm to the Tribe's interests due to the notice procedure, compliance with NEPA, and laches. The issue of whether a moratorium should be issued by the Court was also tried. Such moratorium would toll the running of the primary terms and rentals of the leases during the pendency of the litigation. Counterclaims have not yet been considered by the Court.

## II. REGULATIONS AND PUBLICATION OF THE NOTICE OF SALE.

The Tribe claims violations of federal regulations, specifically 25 C.F.R. Section 171.3, by the Secretary of the Interior and his agencies. It is claimed that this resulted in noncompetitive bidding in the leasing of Tribal lands and, thus, the sales brought less than the true value of bonus payments for the lands leased.

Cross motions for partial summary judgment were filed on this issue, and the Court conducted a hearing on the motions. Subsequently, the Court announced its ruling that there had been technical violations of the notice provisions of the regulations. However, summary judgment ordering cancellation of the leases was denied since the Court thought it appropriate to extend the Defendants an opportunity to show that no adverse effects had been suffered by the Tribe. Also, the Court felt it appropriate to extend Defendants the opportunity to show laches on the part of the Tribe.

25 C.F.R. Section 171.3 contains the regulations promulgated by the Secretary pursuant to the statute codified at 25 U.S.C. Section 396b. That statute became law in 1938. It contains the requirements for sales of oil and gas leases on Indian lands such as the Jicarilla Apache Reservation. The statute provides in pertinent part:

> Leases ... shall be offered for sale ... after notice and advertisement .... Such advertisement shall reserve to the Secretary of the Interior the right to reject all bids whenever in his judgment

sources, Inc., (4) Benson-Montin & Greer Drilling Co., (5) Marrion & Bayless Drilling Co., (6) Engineering & Production Service, (7) Amoco Production Co., (8) J. M. Huber Corp., (9) Mesa Petroleum Co., (10) Union Oil Co. of California, (11) Dugan Production Corp., (12) Southland Royalty Co., and (13) Gulf Oil Corp.

**2.** Plaintiff's Exhibit 6F shows the following:

| Sale No. | Sale Date | Acres Offered | Acres Leased | Total Bonus | Average Bonus per Acre |
|---|---|---|---|---|---|
| 1 | 4/22/70 | 58,080.88 | 32,188.36 | $87,202.37 | $2.71 |
| 2 | 7/14/71 | 89,534.98 | 73,411.00 | $219,897.85 | $3.00 |
| 3 | 11/17/71 | 58,317.60 | 19,039.52 | $46,206.41 | $2.43 |
| 4 | 9/6/72 | 209,952.44 | 151,478.73 | $332,109.40 | $2.19 |

the interest of the Indians will be served by so doing. . . .

Federal regulations require that after tribal authorization has been obtained, notices be published at least thirty (30) days in advance of the sale. The notices must contain, among other things, the information that specific tracts will be offered to the highest responsible bidder for a bonus consideration in addition to stipulated rentals and royalties. 25 C.F.R. Section 171.3(a). In addition, the regulations require that all notices or advertisements of sales of oil and gas leases must state the right of the Secretary of the Interior to reject bids when such is in the best interest of the Indians. 25 C.F.R. Section 171.3(b).[3]

The Secretary of the Interior has delegated many of his responsibilities to Indian Tribes to agencies within the Department of the Interior. One is the Bureau of Indian Affairs (BIA). The BIA is charged with carrying out trust responsibilities of the United States for Indian Tribes under the supervision and direction of the Secretary.

Another is the United States Geological Survey (USGS). The USGS is charged by law and regulation with supervision of exploration, drilling and development of Indian oil and gas lands, and accounting for royalties by lessees to Indian Tribes, under the supervision and direction of the Secretary.

The procedure employed by the local area offices of the BIA and USGS to comply with these regulations was as follows. Upon receipt of an indication of interest by a company or individual in leasing Tribal lands for oil or gas, the BIA contacted the Tribe to determine whether its Tribal Council wished to offer acreage for lease in the particular area. If so, the Tribal Council adopted a resolution authorizing the BIA to offer Tribal lands for oil and gas leasing. More than thirty (30) days prior to the proposed lease sale, a "short form" notice was published in at least two oil and gas journals and press releases were sent to a local newspaper and to at least one nearby metropolitan newspaper.[4] The "short

3. The complete text of 25 C.F.R. Section 171.3 is as follows:

"(a) At such times and in such manner as he may deem appropriate, after being authorized by the tribal council or other authorized representative of the tribe, the superintendent shall publish notices at least thirty days prior to the sale, unless a shorter period is authorized by the Commissioner of Indian Affairs, that oil and gas leases on specific tracts, each of which shall be in a reasonably compact body, will be offered to the highest responsible bidder for a bonus consideration, in addition to stipulated rentals and royalties. Each bid must be accompanied by a cashier's check, certified check or postal money order, payable to the payee designated in the invitation to bid, in an amount not less than 25 percent of the bonus bid. Within 30 days after notification of being the successful bidder, said bidder must remit the balance of the bonus, the first year's rental, and his share of the advertising costs, and shall file with the superintendent the lease in completed form. The superintendent may, for good and sufficient reasons, extend the time for the completion and submission of the lease form, but no extension shall be granted for remitting the balance of moneys due. If the successful bidder fails to pay the full consideration within said period, or fails to file the completed lease within said period or extension thereof, or if the lease is disapproved through no fault

of the lessor or the Department of the Interior, 25 percent of the bonus bid will be forfeited for the use and benefit of the Indian lessor.

"(b) All notices or advertisements of sales of oil and gas leases shall reserve to the Secretary of the Interior the right to reject all bids when in his judgment the interests of the Indians will be best served by so doing, and that if no satisfactory bid is received, or if the accepted bidder fails to complete the lease, or if the Secretary of the Interior shall determine that it is unwise in the interests of the Indians to accept the highest bid, the Secretary may readvertise such lease for sale, or if deemed advisable, with the consent of the tribal council or other governing tribal authorities, a lease may be made by private negotiations. The successful bidder or bidders will be required to pay his or their share of the advertising costs. Amounts received from unsuccessful bidders will be returned; but when no bid is accepted on a tract, the costs of advertising will be assessed against the applicant who requested that said tract be advertised."

4. An example of the "short form" notice was provided to the Court. It reads:

LEGAL NOTICE
U.S. DEPARTMENT OF THE INTERIOR,
BUREAU OF INDIAN AFFAIRS.

form" notice was not intended to and did not comply with all the requirements of the regulations.

The BIA maintained a card file of individuals and companies which had expressed an interest in oil and gas leases on the Jicarilla Reservation. More than 30 days prior to the sale, a "long form" notice was sent to the names in the card file. Bulk mailings of the "long form" notice were made to some post offices in the area to be put on display. In addition, the "long form" notice was sent to anyone requesting details of the sale. One source of knowledge of the sale, fragmentary though it might be, was the "short form" notice.

It is undisputed that the "long form" notice contained all the information required by the regulations.

Elements prescribed by the regulation which were missing from the "short form" notice were the following:

1. A description of the specific tracts being offered.

2. The stipulated rentals and royalties,[5] and

3. Information that the Secretary had the right to reject bids.

The Tribe complains that the procedure used to advertise bidding was defective, and that the defective notice procedure damaged the Tribe financially by reducing the numbers of bidders and the amount of the bids. It claims that the BIA did not comply with the 30-day requirement because the long form was not published and the short form was inadequate in that it did not provide prospective lessees enough information and time to formulate and submit bids.

The Tribe also attempts to read some requirements into the regulations which it

claims would have benefitted the Tribe. One is to make public the name of the company requesting that acreage be offered, along with the specific acreage requested. Another is to advise the Tribe of the specific tracts to be offered prior to getting the Tribe's approval for advertising the lease sale. Neither of these procedures was employed by the BIA or USGS.

The Tribe sought cancellation of the leases on a motion for summary judgment on the issue of non-compliance with the notice regulations. Defendants had already moved for summary judgment on this issue.

■ The Court rejected plaintiff's contentions that the Tribe had to know in advance of giving its approval for advertisement of lease sales the specific tracts to be offered. This ruling did not carry the implication that the Tribe cannot demand such information and restrict authority to notice of sale to a specific tract. It was, and is, the Court's opinion that, under Section 171.3, the Tribe may invest "the Superintendent" with authority which is broader than publication of notice on a specific tract; that is, say, tract "A". The Tribe may, for example, authorize the Superintendent, in his discretion, to publish notice of sale on all or a part of the reservation which constitutes more than tract "A". If tract "A" lies entirely within that part authorized to be noticed for sale, it would appear clearly that the noticed sale is within the discretion given by the Tribe to the Superintendent. It is only necessary that the specific tract rest within the authority given by tribal resolution, whatever the dimensions of that authority may be. If the Tribe wishes to restrict authority to notice only a specific tract then the Tribe need only have the resolution say so.

Notice is hereby given that 25 tracts of Jicarilla Tribal lands comprising 58,017 acres located in Rio Arriba and Sandoval Counties, New Mexico in the Eastern San Juan Basin are offered for Competitive Bidding for Oil and Gas Leasing through sealed bids. Leases will be granted to the qualified bidder of the highest cash bonus offer per acre. Bids will be opened at 2:00 p.m. Mountain Standard Time, April 22, 1970 in the office of the Jicarilla Apache Tribe, Dulce, New Mexico. Full

details of the offering, how, when, and where to submit bids may be obtained from the Superintendent, Jicarilla Agency, Dulce, New Mexico 87528, Telephone Number (505) 759–3201.

5. For these lease sales, rentals were stipulated at $1.25 per acre per year, and royalties at $\frac{1}{6}$ or $16\frac{2}{3}\%$. Rentals paid are deducted from any royalties paid for that year.

Also rejected was the Tribe's argument concerning the practice of keeping confidential the names of companies or individuals requesting that acreage be put up for bidding.

The two claims above are not requirements of the regulations.

■ And while the "short form" did not explicitly reserve the Secretary's right to reject all bids as required by statute and regulation, the Court's opinion was, and is, that there is not significant impact on competitive bidding due to this defect. This provision appears designed to make clear to bidders that the notice of sale is not an offer but rather an invitation to bidders to make offers.

While the "short form" notice, the "long form" notice and the totality of circumstances in which these were treated must be viewed together to determine compliance, that total context must yet satisfy the 30-day publication requirement.

The public at large, 30 days prior to sale, through "publication" of the short form in the newspapers and trade journals, was informed that something was going on at the Reservation. But if any members of this class of prospective bidders were not on the list of companies or individuals to whom the "long form" was mailed, the former would not have the information necessary to formulate bids. And, if moved to get it, instead of having it presented to them, the time necessary to formulate the bid was shortened by whatever time was necessary to secure that information. This time factor cannot be dismissed as insignificant. And who is to say that those who were reached with information in the published "short form" only would not have strengthened the competition in bidding had the information necessary to formulate a bid been at hand.

The intrinsic value and purpose of the 30-day requirement stands out in boldest relief in the Bureau of Indian Affairs Manual (BIAM).[6] While BIAM provides for both the "long form" and "short form" notices, the Manual instructs the Superintendent:

> Unless a shorter time is prescribed by the Central Office, the advertisements should provide for a *minimum* 30 day period for submission of bids. Any requests to the Central Office for a shorter period should be accompanied by a full justification. *In any case, in order to enhance competition the last date for submission of bids should be set far enough in advance to enable readers of such advertisements published in a newspaper or trade journal a reasonable time to consider the matter and prepare and submit bids.* ((Emphasis added); (H. TeCube Exhibit C; Southland Exhibit B))

■ The Court was, and is, of the opinion that the Section 171.3 mandate to the Superintendent to "publish notices" was not met by mailing of the required information to a list of companies and individuals who had, in the past, expressed interest in tribal oil and gas leases. The adequacy of the list is only one of the soft spots in the procedure employed. Mailing to a list of companies and individuals who have previously expressed interest is probably a laudable and efficient way of enhancing competitive bidding. But it is not compliance with the statute or regulations. The procedures employed, viewed as a whole, did not reach the Section 171.3 mark.

■ Defendants argued that this Court should defer to long-standing agency interpretation of its own regulations. *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), *reh. denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *Harvey v. Udall,* 384 F.2d 883 (10th Cir. 1967). While this is a general principle of statutory interpretation, it is a general principle of Indian law that statutes must be liberally construed in favor of the Tribe. *Pence v.*

---

**6.** The BIAM was issued on June 24, 1954, and represents the BIA's internal agency interpretation of federal statutes and regulations.

*Kleppe,* 529 F.2d 135 (9th Cir. 1976). This is especially true when the statute is ambiguous, for it should be construed to benefit Indians. *Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253 (9th Cir. 1976). Also, statutes passed to benefit Indians are to be liberally construed and all doubts are to be resolved in their favor. *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Of course, the same rules of construction apply to administrative regulations. *Rucker v. Wabash Railroad Co.,* 418 F.2d 146 (7th Cir. 1969), citing II Sutherland, Statutes and Statutory Construction, Section 4007, p. 280 (3d ed. 1943).

Defendants also argued that all BIA and USGS area offices have followed the same procedure in advertising for sale all Indian oil and gas leases, and that this Court should not now overturn such widespread practice. However, the only proof on this point in the summary judgment stage was that the same forms, long and short, were available to the area offices. There was no proof pre-trial or during the trial that any other area offices had employed the same procedure with respect to the timing of release of the two forms. The Court, thus, rejects this argument as not established by the evidence.

*Gray v. Johnson,* 395 F.2d 533 (10th Cir. 1968), *cert. denied* 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968), supports the proposition that the Secretary of the Interior may cancel a lease of Indian land where pre-lease steps violate the leasing regulations and the lease is not deemed to be in the best interests of the Indian. *Gray* supports the discretion of the Secretary to cancel. It does not teach that cancellation follows all violations of pre-lease regulations as a matter of course.

> In the circumstances, the execution of the lease was an administrative error which the Secretary can correct by cancellation of the lease. (citations omitted) We believe that the action of the Secretary was proper. 395 F.2d at 537.

On ruling on the cross motions for summary judgment, the Court found that there were "technical" violations of the regulations. This characterization was not intended to depreciate the substance of the defect. The term was employed to bridge a trail to an investigation which might lead to a remedy yet appropriate but not as cruel and harsh as cancellation if, indeed, a remedy should be granted at all.

Having found violations of regulations, the Court thought it necessary to look at whether any harm to the Tribe's interests resulted from those violations. The Tribe's theory is that violation of the notice provisions of the regulations resulted in noncompetitive bidding and lower bonus bids. Thus, at trial defendants were permitted to attempt to convince the Court that any defects in the notice procedures did not result in harm to the Tribe's interests.

■ In effect, the Court shifted the burden onto Defendants to prove the Tribe had suffered no damage as a result of the technical violations of the notice procedure. *Gray v. Johnson, supra,* provides a rationale for such a procedure. There, the court upheld the remedy of lease cancellation on Indian land where two factors were present: pre-lease violation of a pertinent federal regulation *and* the lease was not in the best interests of the Indian. While *Gray* did not discuss a causal connection between those two factors, this Court felt that in equity a remedy should not be afforded the Tribe unless the violations complained of were the cause of alleged damage to its interests. However, it was also felt that having carried the burden of establishing the violations, and having made out a prima facie case of harm to its interests from lower bonus bids, the Tribe should not be required to prove the causal connection. In *Gray,* the court said:

> Actions by the local agency contrary to the regulations *and* contrary to the best interest of the Indian do not create a vested right in the lease. Agents of the government must act within the bounds of their authority; and one who deals with them assumes the risk that they are

so acting. (emphasis added) 395 F.2d at 537.

Here, the risk is cancellation of oil and gas leases. In order to save their leases from such a remedy, the Court has allowed defendants every opportunity to show no violation of regulations and no harm to Indian interests. Presumably, the lessee companies are on notice of matters in the United States Code and regulations, so no unfairness results when defendants are given the burden of proof with respect to these matters. Another rationale for shifting the burden onto defendants can be found in 25 U.S.C. Section 194, which states that the "white man" has the burden of proof in matters involving land where the Indian has established a presumption of title to the land in himself. The Court realizes that this statute is not at issue in this lawsuit, but it is included here merely for purposes of analogy.

■ In rebutting the existence of harm to the Tribe and of a causal connection between regulation violations and harm to the Tribe, defendants failed to carry their burden at trial. The energy company defendants called as witnesses six federal employees with responsibilities in regard to oil and gas leasing, and several representatives of the defendant companies. The testimony of these witnesses did not establish either lack of harm to the Tribe or lack of causation between the technical violations and the alleged harm to the Tribe.

The testimony presented by the energy company defendants was not convincing that the Tribe had received fair and reasonable bonus payments for the leases. Mr. Jerry Long, the representative from the USGS responsible for accepting bids, testified that in his opinion the Tribe had received fair and adequate compensation for the leases. In accepting bids, he had considered factors such as prices paid for previous lease sales in the area, the number of bidders on the tract, the price of natural gas at the time, and whether the acreage was "wildcat" or producing.[7] However, Mr. Long did not keep track of Federal Power Commission (FPC) pricing of natural gas[8] and, with one known exception, he accepted all bids without delay even though on a great number of tracts there was only one bid.

The rest of the testimony presented by defendants on the issue of the Tribe's receiving adequate bonus payments for the leases came from representatives of the defendant energy companies. These witnesses generally made conclusory statements to the effect that they had paid as much as they thought the leases were worth, and that they would not have paid any more for the leases. However, on cross-examination several of those witnesses admitted that one of the factors they considered in formulating their bids was the amount of competition for Jicarilla leases in previous lease sales. Some admitted that their companies might have bid more if they had known there would be more competition in the bidding. Thus, the inference that the defective notice procedure resulted in harm to the Tribe's economic interests was not effectively refuted.

Moreover, the Tribe produced expert testimony to the effect that the Tribe had, for most of the tracts leased, received less than adequate compensation. Val Reese, a consulting geologist for the Tribe, completed a study in January 1977 concerning adequacy of bonuses paid the Tribe in the four oil and gas lease sales at issue in this lawsuit (Plaintiff's Exhibit 13B). Mr. Reese has been familiar with oil and gas development in the San Juan Basin since 1951 when he was employed by Phillips Petroleum Co. as District Geologist in the Basin area. He reviewed his records and knowledge of the area in arriving at a recommended lease

---

7. "Wildcat" acreage is acreage on which there is no known production and is considered high risk in the trade.

8. On July 15, 1971, one day after the third lease sale involved here, the FPC issued Order No. 435 which raised the rates for future sales of natural gas. (Plaintiff's Exhibit 14, of which the Court took judicial notice.) Knowledge concerning this action was known in the industry prior to the July 15 Order.

bonus payment for each tract leased in each of the four lease sales. In arriving at a dollar figure per acre for each lease, he based his estimates as much as possible on geological information available at the time of the lease sales in 1970, 1971 and 1972, including then established production trends. Thus, his estimates do not reflect the current value of the acreage, which, because of increased geological information on the area and the skyrocketing prices for oil and gas, is certainly much higher than it was in the early 1970s. The Court notes that Mr. Reese's recommended bonuses are in most cases higher than the actual bonuses paid for the leases. This is most strikingly true for the leases on the northern half of the reservation. The Court finds that Mr. Reese's credibility was only partially impeached by an admission that he could not totally disregard information gained since the early 1970s in arriving at his recommended lease bonuses, and by the fact that he was hired by the Tribe. On the whole, the Court finds his testimony competent and credible, based as it was on his long and extensive familiarity with the geology of the area with specific reference to oil and gas development in the San Juan Basin. To the extent the Court feels Mr. Reese's testimony was impeached, to this extent has been discounted his estimate as to the amount of bonus payment each lease should have generated.

On the issue of whether the harm to the economic interests of the Tribe as described above was caused in any way by the inadequacy of the notice procedure, defendants again have failed to meet their burden of showing that the notice procedure used actually served the notice function of promoting competitive bidding and deriving maximum benefit for the Tribe, or that a proper notice procedure would not have increased the number and amounts of the bids.

Defendants introduced as an exhibit the card file kept by the BIA. That file did contain over 300 names, and the BIA realty specialist testified that the long form notices were sent out to all names in the file. He also testified that the file was kept current by deleting names if the mailed notices were returned as undeliverable. However, the Tribe produced an expert witness, Dr. Alfred Parker, who had done a study indicating that a large percentage of the names in the file never actually received the notices for the four lease sales in question. It was stipulated at trial that the card file as it existed at the time of trial was in essentially the same condition as it was in 1972, the date of the fourth lease sale. In June 1976, Dr. Parker had sent questionnaires to all names on the list. One of the questions was, "Did you receive the mailed notice?" Of the companies and individuals who responded, some 30.7% answered in the negative, while another 36% did not answer that question. Dr. Parker concluded that even of prospective bidders on the list some 20%–50% did not receive the long form notice. He also concluded that the list was and had been for a long time in need of revision, since some of the respondents had indicated their companies were not in business during the years of the four lease sales in question.

Some defense witnesses who were representative of the various defendant energy companies testified that they were on the list and remembered receiving the long form notices for all or some of the lease sales. That testimony does not convince the Court that all those who might have been interested in bidding on Jicarilla oil and gas leases received the long form notice.

Defendants produced no expert testimony tending to show that all prospective bidders actually got notice of the Jicarilla lease sales. The Court finds that despite considerable interest in oil and gas leasing on Jicarilla lands, the number of bids on each tract was low (0–4). Further, the Court finds that defendants did not prove that the notice procedure used promoted competitive bidding.

In an attempt to prove that the low number and amounts of the bids were due to factors other than the defective notice procedure, defendants put on testimony that

the acreage was considered "wildcat" and speculative. This may be true, but this was taken into account by Val Reese when he made his estimates. Furthermore, there was production near some of the acreage. Another theory advanced by defendants was that the market for natural gas was "depressed" at the time of the lease sales, thus accounting for the low bids. This, too, was a factor considered by Mr. Reese in arriving at his estimates. Also, the FPC in 1971 raised the price of natural gas, and it was common knowledge in the industry, at least at the time of the last three sales, that gas shortages were on the horizon. Since these Indian leases are long-term leases with a primary term of ten years and a secondary term for as long as oil or gas is produced in paying quantities, future gas shortages would certainly be a reasonable factor on which to base a bid. Likewise, the contention by some of the defense witnesses that other economic and geological factors determined the amount of their bids is seen by the Court as not addressing the central notice issue. Certainly, such factors as a company's budget constraints, costs of drilling, likelihood of production, availability of pipeline hookups, etc., influenced the amount a company bid on any given tract. But that does not negate the possibility that amount of competition or lack thereof was *not* a factor. Nor does it mean that a better notice procedure would not have produced more and higher bids.

The importance of the interpretation of the 30-day requirement was brought out through testimony of industry representatives called as defense witnesses. For example, one witness testified that the internal company procedure in formulating a bid after receiving the long-form notice involved at least four steps in four different departments. Adding up the number of days for each step, the total number of days needed to formulate a bid comes to 33–40 days. This would seem to imply that the 30-day notice requirement should be an absolute minimum.

Other evidence showed that one of the companies drastically reduced the amount of its bids from the original recommenda-tion. The only explanation for such reduction was "budget", although the company was aware of the low numbers of bidders in previous sales of oil and gas leases on Jicarilla land. The Court believes that lack of competition was one factor in that company's bid reduction. It was the successful bidder on several leases.

One witness testified that he thought that wider advertising might have attracted more bidders, but that the bids would not have been any higher. This theory flies in the face of the reasoning behind the statutory and regulatory directives for competitive bidding, and must be rejected by the Court.

Nowhere have defendants proven to the Court's satisfaction that comparable oil and gas leasing on non-Jicarilla lands brought similar numbers of bids and similar prices. The only expert testimony on that issue was by plaintiff's expert, Parker, who compared oil and gas bonus per acre for 1970, 1971 and 1972 between Jicarilla leases and BLM leases in several southwestern states, including New Mexico. All figures were for competitive leases, and the bonuses for Jicarilla land were far below those for almost all other land. Plaintiff's Exhibit 3A. Parker's comparison does not control for quality of land, differences in rentals and royalties, and other factors. Defendants did not enlighten the Court on those factors and, therefore, failed to carry their burden.

What emerged at trial was a picture of inadequate competition in bidding on oil and gas leases on Jicarilla land, reductions in bids because of this lack of competition, and a resultant economic harm to the Tribe. These effects were at least partly due to the defective notice procedure used by the Secretary. While the energy companies did not have any responsibility to promote competitive bidding, they were the beneficiaries of the low bids.

■ Defendants asserted the equitable defenses of laches, estoppel, waiver, unclean hands, release and discharge. The Court finds and concludes that these defenses have not been established. The mere fact

that the Tribe approved all bids which were accepted by USGS does not preclude the Tribe from prevailing on its claim. Further, despite the long delay by the Tribe in asserting its claim, defendants will not, it is felt, be unduly harmed or prejudiced by the remedy employed by this Court.

The remedy sought by the Tribe in its First Amended Complaint is for this Court to declare the actions of the Secretary and his agencies in conducting the lease sales illegal and invalid, and for the Court to direct the Secretary to cancel those leases on which no drilling has been contracted or is in progress, or on which no production has been obtained in paying quantities. I decline to order outright cancellation. Lack of competition affects primarily the amount of the bonus payments. It does not mean the companies who were successful bidders are not proper lessees. Rentals and royalties are fixed, and no claim for breach of the leases has been lodged here. I will declare the actions of the Secretary with respect to the notice procedure to be in violation of federal statute and regulations. I will order that the Secretary cancel a lease unless, within 60 days from entry of final judgment, the particular lessee pays plaintiff Jicarilla Apache Tribe an adjusted bonus equal to the difference between the bonus actually paid and 60% of the bonus payment recommended by Val Reese in his evaluation of lease bonuses. The latter is plaintiff's Exhibit 13B, a copy of which is attached to this Opinion. Of course, if the bonus actually paid was greater than 60% of Reese's recommendation, no amount will be due. Also, despite the fact that plaintiff did not seek cancellation of those leases in which there is production as outlined above, this order applies to all leases involved in this case.

## III. NATIONAL ENVIRONMENTAL POLICY ACT.

The Tribe claims that the Secretary of the Interior violated the National Environ-

mental Policy Act (NEPA), 42 U.S.C. Section 4321 et seq. by not preparing an environmental impact statement (EIS) prior to approving oil and gas leases on the Jicarilla Apache Reservation. It seeks cancellation of the leases so approved because of non-compliance with NEPA or, alternatively, an injunction restraining further development on the leases pending preparation of a court-ordered EIS.

NEPA became law on January 1, 1970. The leases at issue in this case were all entered into after NEPA's effective date. The statute requires preparation of an EIS prior to any major federal action significantly affecting the quality of the human environment. All parties admit that no effort to comply with NEPA was made with respect to these leases. The explanation for that failure is that until the Tenth Circuit decision in Davis v. Morton, 469 F.2d 593 (10th Cir. 1972), it was generally thought that the mere approval of leases on Indian lands by the Secretary of the Interior was not covered by NEPA. The Tenth Circuit ruled that NEPA was intended to cover all federal agencies, including the Bureau of Indian Affairs (BIA) in relation to approval of leases of Indian Tribal lands.

Formal compliance with NEPA with respect to these leases was first attempted in 1976, when an "environmental assessment" (EA) was published covering all four lease sales (Plaintiff's Exhibit 38).[9] Further action was taken during the pendency of this lawsuit culminating in the publication of a draft "cumulative environmental assessment" in November 1979, well after completion of this trial on the merits. The latter document was finalized and filed with the Court in January 1980.

The Tribe asserts that the 1976 EA was inadequate or incorrect or both. In that EA, prepared on behalf of the Secretary of the Interior by the BIA Albuquerque area office, a "negative declaration" was made, such that it was decided not to prepare an EIS. Such a negative declaration is tanta-

---

9. After Davis v. Morton was decided, the USGS began preparing an EA for each application to drill. Those EAs are not very detailed nor do they address the cumulative impact of the extensive oil and gas activity on the Reservation.

mount to a determination that the approval of the leases did not constitute major federal action significantly affecting the quality of the human environment. At trial, the Tribe attempted to show first that the information contained in the document was inadequate to make a negative declaration, and second that the negative declaration was incorrect because the action of the Secretary in approving the leases was major federal action significantly affecting the quality of the human environment.

■ Defendants assert that the Tribe lacks standing to prosecute this action under NEPA because it advances only economic and proprietary interests. While the Court believes, and finds, that Plaintiff's overriding concern is, in fact, financial and not environmental, the Tribe, nevertheless, has standing. *National Helium Corporation v. Morton,* 455 F.2d 650 (10th Cir. 1971) laid to rest defendants' argument with respect to standing. There, the plaintiff helium companies with substantial financial interests in government contracts sought to enjoin termination of those contracts because an EIS had not been prepared. The court said:

> "But it is their asserted representation of the public interest—which from their personal standpoint is admittedly less important than their private financial stake— which in final analysis justifies their seeking judicial review." 455 F.2d at 654.

Thus, the Court concludes that plaintiff has standing to bring this action under NEPA.

Agency procedures which fall short of a full EIS have not met with much approval in this Circuit. *Jette v. Bergland,* 579 F.2d 59 (10th Cir. 1978); *cf., State of Wyoming v. Hathaway,* 525 F.2d 66 (10th Cir. 1975) (dissenting opinion). However, for the reasons stated below, the Court does not reach the substantive questions of whether oil and gas activity by lessee defendants constitutes major federal action significantly affecting the quality of the human environment, or whether the 1976 EA is adequate to support its negative declaration.

■ Defendants assert that plaintiff is barred from asserting its NEPA cause of action by the doctrine of laches. Laches is an affirmative defense available in environmental litigation. *Save Our Wetlands v. U.S. Army Corps of Engineers,* 549 F.2d 1021 (5th Cir. 1977), *cert. denied* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Lathan v. Volpe,* 455 F.2d 1111 (9th Cir. 1971). The doctrine of laches, however, is not favored in environmental litigation because of the interests of the general public in environmental quality. *Cady v. Morton,* 527 F.2d 786 (9th Cir. 1975), citing *Minnesota PIRG v. Butz,* 498 F.2d 1314 (8th Cir. 1974). Thus, the delay of a named plaintiff should not prejudice the rights of the public, which rights must be considered and balanced against the rights of the defendants. Laches is an equitable doctrine employed to prevent judicial resolution of a claim where an unreasonable delay by the plaintiff has induced a change in defendant's position such that the imposition of a judicial remedy would prejudice defendant. The elements of a finding of laches are (1) a delay in filing suit, (2) which delay is unreasonable under the circumstances, and (3) undue prejudice to those asserting the defense. *Save Our Wetlands v. U.S. Army Corps of Engineers, supra.* Laches is a question of fact addressed to the sound discretion of the trial court based on the circumstances of the particular case. *Environmental Defense Fund, Inc. v. Alexander,* 467 F.Supp. 885 (N.D. Miss. 1979).

Here, the Tribe has, of course, known of the existence of the leases since their execution. It knew of the proposed sale of the leases months before each lease sale, as the advertising of leases for bids had to be approved by the Tribal Council. Thus, the facts involved in this cause of action were known to the Tribe at least by the dates of the four lease sales. NEPA became law on January 1, 1970. This suit was filed on September 21, 1976, more than six years later. *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973) is distinguishable on this factor. There, the circuit court thought there had been delay of considerably less than a year, and the district court had not made a finding of laches.

The Tribe has been involved in oil and gas leasing at least since the 1950s, especially on the southern half of the Reservation. Besides the protective trust relationship with the United States Government, the Tribe has employed competent private legal counsel to protect its interests. While NEPA application to approval of leases on Indian lands was not set at rest until 1972, the Court is aware that the Tribe and others filed suit in 1971 against the Secretary of the Interior and others, and that one of the causes of action in that suit was based on an alleged violation of NEPA. *Jicarilla Apache Tribe, et al. v. Rogers C.B. Morton, et al.*, D.D.C. June 2, 1971. (Testimony of Echohawk) The Tribe's general counsel was aware by late 1972 or early 1973 that NEPA was applicable to lease sales on Indian land. (Testimony of Olsen) Thus, the delay in bringing this suit was inexcusable and unreasonably delayed.

Moreover, this delay resulted in prejudice to the lessee defendants. Because they had no notice that anything was amiss with their Jicarilla leases until the institution of this suit, they have invested well over $12 million in the leases in the form of bonus payments, rentals, administrative overhead costs, plus exploration, drilling and production costs. Were they to lose their leases, much of that investment would be lost, not to mention the loss of future profits based on investments already made.

While defendants have established all the elements of laches, further considerations which affect the public interest (including the Tribe's) have influenced the Court in arriving at a finding of laches. The country is in the midst of a crisis in relation to energy supplies. Every feasible domestic effort to alleviate the crisis should be employed. This does not mean, however, that environmental concerns have been ignored by the Court. Even though a full EIS has not been done and is not anticipated, concern for harm to the environment is adequately addressed in the EAs prepared by the Secretary. Further, environmental concerns will be adequately served by adherence to procedures mandated by existing statutes and regulations.

Each lease in this action obligates the lessee to furnish bonds required by regulations of the Secretary, conditioned upon compliance with the terms of the lease (Lease, Para. 3(a)), and to abide by and conform to any and all regulations of the Secretary presently or prospectively in force with respect to such leases (Lease, Para. 3(g)). Thus, the leases incorporate by reference all present and future regulations which the Secretary may feel necessary for the protection of the environment. The leases also contain specific clauses dealing with environmental protection (Lease, Para. 3(f)).

In Forest and Land Stipulations agreed to by each lessee-defendant, the lessee agrees to conduct all operations in such a manner as to avoid unnecessary damage to vegetation, timber, crops, or other cover, to control soil erosion, to prevent pollution of soil and water, and to fence all sump holes or other excavations made by the lessee (Para. 1). The Forest and Land Stipulations govern the use of water (Para. 4), the cutting of timber (Para. 5), the prevention of fire (Para. 6), and the location of any campsites (Para. 7).

From the evidence adduced at trial, including the exhibits and testimony of witnesses, there emerges a picture of adequate environmental protection to be effected by the BIA and the USGS. Throughout the four phases of oil and gas mining, exploration, development, production and abandonment, these two agencies monitor nearly all aspects of lessees' activities. Permits from USGS must be obtained prior to any intensive surface exploration such as use of explosives, thumper techniques and vibrator techniques, which may involve use of heavy equipment and construction of access roads. Permits to drill exploratory wells must also be obtained from USGS. Lessees must submit development plans to USGS and BIA prior to any development drilling. Drilling with all its ancillary activities must be carried on in a workmanlike manner with specific attention to environmental protec-

tion (Lease, Para. 3(f)). Well-abandonment must be to the satisfaction of the BIA, subject to forfeiture of lessee's bond. See, also, BIA regulations compiled in 25 C.F.R. Part 171, and USGS regulations compiled in 30 C.F.R. Part 221.

It has been stipulated by the parties that the environmental procedures contained in USGS Conservation Division Manual Part 632 (CDM 632), Defendant's Exhibit FF–1, are complied with. CDM 632 prescribes exhaustive procedures to prevent degradation of the quality of the human environment by operations on the leases involved in this action. Besides requiring a USGS environmental analysis prior to the approval of any application to drill, an on-site inspection by USGS and BIA is required. Endangered species clearances and cultural resources clearances with respect to archeological remains are required.

The 1976 EA addresses each of the five subject areas of Section 102(2)(C) of NEPA: the environmental impact of the proposed action; adverse environmental effects which are unavoidable; alternatives to the proposed action; short-term uses and long-term productivity; and irreversible and irretrievable commitments of resources.

Especially noteworthy is the section which discusses mitigating measures that can be taken to lessen environmental damage (1976 EA at p. 64 *et seq.*). Most of these measures are already being taken principally by USGS and the BIA Realty Office. Those mitigating measures not presently being followed can be imposed under the terms of the leases by agency practice or by promulgation of new regulations by the Secretary. The leases stipulate that upon termination the lessee must show the Secretary (or his agency, the BIA) that it has conserved and protected the property with proper abandonment of all wells. Furthermore, in 30 C.F.R. Part 221 the USGS is by regulation given the power to shut down drilling operations, cancel the lease and forfeit the bond if any violations of federal regulations have occurred.

All the existing procedures employed by BIA and USGS, and the Stipulations contained in the leases, when coupled with the analysis in the 1976 EA as supplemented by the 1980 Comprehensive EA, insure full Interior Department compliance with the goals of NEPA with respect to oil and gas development on the leases involved in this action.

In balancing the equities involved in this case, the Court has considered all the above factors, and finds that cancellation of the leases is totally unjustified. The Court further finds that an injunction prohibiting further oil and gas development pending preparation of an EIS would not produce any environmental benefits, *cf., Shiffler v. Schlesinger,* 548 F.2d 96 (3d Cir. 1977).

A finding of laches does not mean that this plaintiff's delay will result in harm to other members of the public with an interest in the area under development. Here, the land sought to be protected is Jicarilla Apache Tribe land. The 1976 EA indicates there is not much public concern about the oil and gas activities on the Jicarilla Reservation.

"They (the public) are apparently either unaware of the magnitude of the activity or they have accepted it as a way of life since approximately 1,277 wells, 400 miles of road, have already been established." Plaintiff's Exhibit 38, 1976 EA, at 108–109.

This is the case despite the fact that a list of 13 federal, state, municipal and tribal agencies were consulted on the matter, plus a list of seven national and state groups concerned with the environment. Thus, the only group asserting interest in the environmental effects of oil and gas leasing on the Jicarilla Reservation appears to be the Tribe itself. And it is the Tribe which has delayed in bringing this suit.

Another equitable consideration is that plaintiff comes to Court with unclean hands. On October 10, 1976, about 20 days after filing this lawsuit, the plaintiff entered into a joint venture agreement with Palmer Oil and Gas Co. for oil and gas development on the reservation. Palmer is not a defendant in this suit. The terms of that agreement are economically more at-

tractive to plaintiff than the lease terms at issue here. The Secretary of Interior took no action to comply with NEPA prior to or subsequent to his approval of the agreement. Similar agreements were entered into with Odessa Natural Corp. and Atlantic Richfield Co. (ARCO), also not defendants in this case, and no NEPA compliance was undertaken by the Secretary or any of his agencies. Instead, the joint lessees hired private firms to prepare documents similar to the 1976 EA, if somewhat more detailed and site specific, dealing as they were with less acreage. No EIS has been prepared nor is any contemplated by plaintiff in connection with these joint venture agreements. In fact, "negative declarations" to the effect that no EIS is required are part of the private environmental documents. The environmental impacts of the joint venture agreements are very similar to those of the leases between plaintiff and these defendants. But plaintiff has not, at any time, requested any governmental agency to prepare an EIS. Also, the plaintiff has not instituted any action against Palmer, Odessa, or ARCO to cancel their agreements or to enjoin further development pending preparation of an EIS. The Court finds that plaintiff is motivated to obtain the maximum compensation possible for the development of oil and gas on the Reservation, and that it would rather secure joint development of oil and gas on the Reservation. In seeking cancellation of the leases obtained by these defendants in the four lease sales in question, the plaintiff is not motivated in good faith by concerns for the environmental impact of oil and gas development on the specified acreage. The purpose of NEPA is to assure that decision makers consider the environmental impacts of a decision. Thus, it would be unjust and inequitable to permit the plaintiff to utilize and employ NEPA as a device solely to secure economic gain, especially where it slept on its rights for a period of time of from four to six years, where there is immediate and profound public interest in oil and gas development and where existing safeguards are in force and have been considered during environmental review to protect all aspects of the environment.

## IV. THE MORATORIUM ISSUE.

The leases at issue in this suit were entered into in the early 1970s. The primary term of each lease is for ten (10) years. The lease term then continues for as long thereafter as oil or gas is produced in paying quantities. The energy company defendants in this action have requested the Court (1) to grant a moratorium on the lease rental requirements, and (2) to toll the primary terms of the leases *pendente lite.* The Tribe has opposed defendants' motions. Both sides submitted briefs on this issue and at trial and during closing arguments the Court announced its intention to toll the primary terms of the leases if it did not cancel the leases. Since the Court has declined to cancel the leases outright on either of plaintiff's causes of action, it will grant defendants' motion to toll as more specifically stated hereafter.

In April 1979, the Secretary of Interior proposed to toll the running of the lease terms pending further compliance with NEPA. The Tribe argued that the Secretary did not have that power because there is no statute authorizing him to do so. That is the law in this and other circuits, see, e.g. *Enfield v. Kleppe,* 566 F.2d 1139 (10th Cir. 1977); *United States v. Missouri-Kansas-Texas R. Co.,* 66 F.2d 919 (10th Cir. 1933); *Holmes v. United States,* 33 F.2d 688 (8th Cir. 1929).

That does not mean, however, that a court of equity does not have such power. Where plaintiff has placed a cloud on the title of a leasehold by seeking judicial cancellation of the lease, a court may, in fairness to the lessee, toll the running of the lease terms. *Continental Oil Co. v. Osage Oil & Refining Co.,* 69 F.2d 19 (10th Cir. 1934). The filing of this lawsuit, while it did not prevent lessees from activities on their leases, did place a cloud on the title of the leaseholds, and, in fact, discouraged several of the companies from proceeding fully with development plans.

For example, as a result of seismic exploration and analysis, defendant Gulf made a

decision some time in 1976 to drill two exploration wells on its Jicarilla leases. On May 7, 1977, Gulf was served with process, although it had notice by letter from the Tribe's President of the pendency of the litigation in the District Court for the District of Columbia as early as May 1976. (Defendant's Exhibit j(2)). Gulf sought the advice of its legal department on whether to go ahead with its drilling plans. (Defendant's Exhibit j(5)) On August 27, 1976, Gulf's legal department wrote, ". . . in view of the pending litigation and the fact that our leases were issued at one of the sales in question, it is my opinion that drilling of the proposed exploratory wells would be ill-advised." (Defendant's Exhibit j(6)). Later, in response to another inquiry about the advisability of drilling the proposed wells, Gulf's legal department informed ". . . in view of the pending litigation, Gulf's title has been clouded (and that) . . . no wells on our Jicarilla leases should be drilled until the lawsuit has been concluded." It is the opinion of this Court that the filing of this action by the Tribe has, in fact, deterred and inhibited Gulf and several other lessee defendants from developing their leases during the pendency of this action.

Plaintiff points out that the oil and gas leases herein were issued pursuant to the statutory authority of 25 U.S.C. Section 396a–g, and that the statute provides that the terms of the leases shall not exceed ten years unless minerals are produced in paying quantities. 25 U.S.C. Section 396a. It argues that the lease term as fixed by statute can only be tolled or extended by another act of Congress, and cites *Arkansas Valley Industries, Inc. v. Freeman,* 415 F.2d 713 (8th Cir. 1969). *Freeman* stands for the proposition that when interpreting a statute which is clear and unambiguous, courts should not alter its explicit terms by application of rules of statutory construction. We are not here concerned with interpretation of a statute, but with the equity powers of this Court where plaintiff has sought equitable remedies. If this Court has not the power to toll the lease terms, it would by the same reasoning be powerless to cancel the leases. 25 U.S.C. Section 396 is actually silent on the subject of tolling, and so this Court believes it within its equitable power to order this remedy. *United States v. Desert Gold Mining Co.,* 448 F.2d 1230 (9th Cir. 1971). Moreover, based on the facts of the case at hand where plaintiff, though not preventing oil and gas development on the leases, placed a cloud on the title of the leaseholds by filing this suit seeking cancellation, and where testimony at trial established that because of that cloud most of the companies were reluctant to fully develop their leases so that oil or gas might be produced in paying quantities, this Court finds in equity and fairness to all concerned that the primary terms of these leases should be tolled. *Twyford v. Whitchurch,* 132 F.2d 819 (10th Cir. 1942); *Mobil Oil Corp. v. Kelley,* 353 F.Supp. 582 (S.D. Ala. 1973), *aff'd* 493 F.2d 784 (5th Cir. 1974); *Gulf Oil Corp. v. Morton,* 345 F.Supp. 685 (C.D. Cal. 1972), *rev'd on other grounds* 493 F.2d 141 (9th Cir. 1973); and *Continental Oil v. Osage Oil & Refining Co., supra,* provide further legal justification for this action.

It shall be the order of this Court that the primary terms of all the leases involved in this action are tolled for the tolling period.

Advance yearly rentals need not be paid on leases which had no production nor, from the date production ceased, on leases on which production ceased during the tolling period.

For purposes of this order the tolling date is the date upon which the particular lessee was served with process in this case. The tolling period is the period from tolling date to the date of judgment entered herein.

V. COUNTERCLAIMS.

Defendants have filed counterclaims against the Tribe. Shortly before trial, defendants were granted leave to amend their counterclaims. The Court realized that further discovery would be needed on the amended counterclaims. So as not to delay the trial, it was decided that the amended counterclaims would not be at issue in the

then upcoming trial, but would be dealt with at a later time. The Tribe has moved to dismiss the counterclaims. Defendants have received an extension of time until February 15, 1980, in which to respond to plaintiff's motion to dismiss.

Unless any of counsel request otherwise, I will await disposition of the counterclaims before a final judgment is entered in this case. If any of counsel request, I will enter a partial final judgment in accord with my rulings in this Memorandum Opinion.

## ON COUNTERCLAIMS

THE COURT has previously entered its Memorandum Opinion in this case on February 12, 1980, in which the Plaintiff Jicarilla Apache Tribe was awarded judgment against the lessee defendants in the form of adjusted bonuses, and in which the Tribe was denied relief on its National Environmental Policy Act claim. The only matters still pending before this Court are the counterclaims asserted by lessee defendants against the Tribe. All counterclaims seek monetary relief from the Tribe for the Tribe's action in filing this lawsuit, and claim as damages such items as bonus payments for the leases, filing fees, advertising costs, rentals paid the Tribe, expenditures for exploration and drilling on the leases prior to the filing of this lawsuit as well as during the pendency of the lawsuit, overhead and miscellaneous expenses, plus interest and costs. Defendants' theories of recovery include a general inequitable or wrongful action by the Tribe in filing suit, breach of lease by the Tribe in filing suit, and violation of various provisions of the Indian Civil Rights Act (ICRA), 25 U.S.C. Section 1301 *et seq.* The Tribe has moved to dismiss the counterclaims; two lessee defendants have moved to dismiss their own counterclaims. All motions to dismiss will be granted, and the Court will now enter final judgment in this case.

A. GULF OIL CORPORATION'S MOTION TO DISMISS. Gulf Oil Corporation has moved to dismiss as moot its counterclaim filed May 23, 1977. In support of its motion, Gulf has attached an exhibit which shows that for each of the four (4) Jicarilla leases held by Gulf, it paid a bonus greater than the adjusted bonus it would have had to pay as a result of this Court's decision. Gulf's counterclaim is predicated upon cancellation of its leases by the Court in this action. Since the Court has ordered cancellation of a lease only in the event that a lessee defendant does not pay the adjusted bonus for that lease, and since Gulf does not owe any such adjusted bonus, it follows that Gulf's leases are not subject to cancellation here. Thus, Gulf's counterclaim is moot and will be dismissed.

B. SOUTHLAND ROYALTY COMPANY'S MOTION TO DISMISS. Southland Royalty Company has also moved to dismiss its amended counterclaim.[1] While Southland's amended counterclaim is not moot in the same sense as Gulf's, the Court finds and concludes that the Tribe will not be prejudiced by the voluntary dismissal of Southland's amended counterclaim. This is because no discovery has been directed to the claims asserted by Southland in its amended counterclaim; these issues have not progressed beyond the filing of the Tribe's motion to dismiss. Further, Southland's amended counterclaim would be dismissed by the same reasoning of the Court used in granting the Tribe's motion to dismiss (see below). And while the Tribe, although requested to do so as required by this District's local rules, did not expressly consent to the granting of Southland's motion to dismiss its counterclaim, the Tribe has not responded to Southland's motion. Our local rules provide that failure to respond to a motion by an adverse party constitutes a consent to the

1. Southland had been granted leave to file its proposed amended counterclaim on March 30, 1979. The Tribe, on April 19, 1979, filed its reply to Southland's amended counterclaim and its motion to dismiss, despite the fact that Southland had not filed its amended counter-claim. Because all parties have proceeded on the assumption that Southland's amended counterclaim was properly filed, the Court later granted Southland's motion to file its amended counterclaim *nunc pro tunc.*

granting of that motion. Rule 9(h), Rules of the United States District Court for the District of New Mexico.

For these reasons, the Court will grant Southland Royalty Company's motion to voluntarily dismiss its amended counterclaim.

C. JICARILLA APACHE TRIBE'S MOTIONS TO DISMISS. Counterclaims were filed by several lessee defendants at an early stage of this litigation. A motion to dismiss counterclaims was filed by the Tribe on March 6, 1978, in which it asserted as grounds: failure to join an indispensable party; failure to state a claim; and counterclaims not ripe. That motion was denied by order of the preceding judge, filed May 9, 1978.

At a later date, Defendant Southland Royalty Company moved to amend its counterclaim, and at a pre-trial hearing before me on March 30, 1979, leave was granted Southland to so amend. Several of the other lessee defendants moved at that time to amend their counterclaims, and leave to amend was granted to all who requested it. After amended counterclaims were filed, the Tribe moved to dismiss each one. This time the Tribe asserted the additional ground of sovereign immunity in support of its motions to dismiss the counterclaims. By letter of February 6, 1980, the Court informed all counsel it would reconsider the previous order denying the Tribe's first motion to dismiss counterclaims.

While the sovereignty of Indian tribes is dependent upon the superior power of the United States, the tribes have traditionally enjoyed immunity from suits against them. It has been stated that tribes are immune from suit absent congressional authorization. *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). This principle has recently been reaffirmed in the context of the Indian Civil Rights Act, 25 U.S.C. Section 1301 *et seq.* Despite the specific congressional act creating a cause of action against Indian tribes for violations of enumerated civil rights, the Supreme Court held that because Congress had not also expressly granted federal jurisdiction in the Act for anything but habeas corpus relief, no federal jurisdiction existed for declaratory and injunctive relief against the Tribe or its officers under the Act. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

It is undisputed that congressional authorization to sue the Tribe is lacking here. Thus, these counterclaims can survive dismissal only if the Tribe has consented to be sued, or if it has waived its immunity by the filing of this suit. Since the Tribe has not consented to suit against it, the only question remaining is that of waiver.

Defendants argue that the Tribe's act of filing suit constitutes a waiver of its sovereign immunity, and that it would be inequitable to afford the Tribe affirmative relief while denying defendants the opportunity to counterclaim for damages allegedly caused by the Tribe. The argument of a general waiver of immunity by implication has been firmly rejected by the courts. *See* 6 Wright & Miller, Federal Practice and Procedure: Civil Section 1427. But counterclaims against the United States have been allowed in a very narrow context. The doctrine of equitable recoupment found its way into the law in a suit filed by the United States against a taxpayer. *Bull v. United States,* 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). There, the Supreme Court held that the sovereign immunity of the United States did not bar a counterclaim by the taxpayer which was in the nature of recoupment and which arose out of the transaction which was the subject of the complaint. The United States had sued for income taxes due; the taxpayer counterclaimed for estate taxes allegedly overpaid on the same taxable event, i.e. the distribution of partnership profits to the estate of a deceased partner. The Supreme Court reasoned that it would be "immoral" and would amount "to a fraud on the taxpayer's rights" to allow the United States to keep the estate tax overpayment and sue to recover income tax from the same taxpayer with respect to the same taxable event. 295 U.S. at 261, 55 S.Ct. at 700.

The doctrine of equitable recoupment has been extended to cases in which a counterclaim was asserted against Indian tribes. *United States v. United States Fidelity & Guaranty Co., supra.* There, the United States on behalf of the Tribes had conceded that defendant could recover up to the amount of the Tribe's judgment against it. It was apparent that both complaint and counterclaim arose from the same transaction or occurrence. The United States sued the guaranty company as surety on a royalty bond. That bond secured royalty payments under mining leases of tribal lands. The bankrupt mining company had defaulted on the royalty payments. The guaranty company counterclaimed for advance royalties allegedly paid by the mining company on the leases in question and for deficit royalties illegally exacted and paid.

 The question, then, arises whether the counterclaims asserted by lessee defendants can fit within the equitable recoupment exception to sovereign immunity announced in *Bull v. United States, supra. See, also, Frederick v. United States,* 386 F.2d 481 (5th Cir. 1967). The Court finds and concludes that these counterclaims do not arise out of the same transaction as the Tribe's amended complaint, and, thus, the Tribe's sovereign immunity bars their adjudication in this case.

Here, the part of the complaint upon which the Tribe will recover is that alleging violations by the Secretary of Interior and his agencies in advertising the leases for sale. The notice process was begun and completed in the early 1970s. It involved actions by the Secretary prior to the signing of the leases in question. The action complained of by the Tribe was action which was over at the time of the lease sales. The counterclaims all allege wrongful action by the Tribe in filing and maintaining this suit. They claim damages flowing from the cloud on title produced by the Tribe's seeking cancellation of the leases. It should be noted that the Tribe has not alleged any breach of the leases by lessee defendants. Further, no breach of the leases has been found, only violations of federal regulations regarding notice of lease sales.

Since the Tribe sought cancellation of the leases, it sought no judgment in the form of money. If cancellation of a lease had been the remedy imposed by the Court for the notice violations it found, then no counterclaims could have been maintained against the Tribe, for no affirmative judgment can be ordered against the sovereign. The Court will order cancellation of a lease only if the adjusted bonus for that lease is not paid. Lessee defendants can, thus, anticipate the following results:

(1) A lessee defendant may keep its leases without paying adjusted bonuses if the bonuses it actually paid were in excess of the adjusted bonus due under the Court's final judgment. Gulf Oil Company is one example. Such a lessee cannot maintain a counterclaim for damages against the Tribe because it would amount to an affirmative judgment against the sovereign.

(2) A lessee defendant may decide not to pay an adjusted bonus due on a particular lease. That lease would be cancelled in accordance with the judgment rendered by the Court. Again, since no money judgment would be recovered by the Tribe against such a lessee defendant, the Tribe's sovereign immunity would bar a counterclaim seeking damages.[2]

2. The following lessee defendants seek relief in their counterclaims only if the Court orders cancellation of their leases or finds them void *ab initio:* Mesa Petroleum Company; Dugan Production Corporation (Counts I–III only); Engineering and Production Services, Inc.; Tesoro Petroleum Company; North American Exploration Company; and Nassau Resources, Inc. If these defendants pay their adjusted bonuses for each lease, then their counterclaims become moot because the counterclaims are predicated upon the judicial remedy of cancellation. If these defendants do not pay the adjusted bonuses for each lease, then the sovereign immunity of the Tribe precludes recovery on the counterclaims.

The following lessee defendants have counterclaims which do not expressly rest solely upon cancellation of their leases: Amoco Production Company; J. M. Huber Corporation; Benson-Montin-Greer Drilling Corporation; Marrion & Bayless Drilling; Union Oil Company; and Dugan Production Corporation (Counts IV–VIII).

(3) A lessee defendant may decide to save its leases from cancellation by paying the adjusted bonuses ordered by the Court. Because none of the counterclaims meet the requirements of the equitable recoupment exception to sovereign immunity, they cannot be maintained to recoup any of the adjusted bonuses due the Tribe.

Lessee defendants-counterclaimants argue that tribal sovereignty can be likened to the sovereignty of a foreign government, and that this Court should hear their counterclaims even if they do not meet the "same transaction or occurrence" test of the doctrine of equitable recoupment, and even if the counterclaims seek recovery in excess of the Tribe's judgment on its complaint. They cite as support *National City Bank of New York v. Republic of China,* 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955). There, the Supreme Court allowed a counterclaim against plaintiff Republic of China which did not arise out of the same transaction or occurrence as the subject matter of the complaint, nor had China consented to the suit. *Republic of China* is distinguishable from the case at bar. That decision rested not only on principles of equity and fairness, but on principles of international law and on a construction of the treaties between the United States and China.

A sovereign foreign nation is separate from and independent of the United States, whereas the Jicarilla Apache Indian Tribe is a dependent domestic sovereign within the United States. Congress can enlarge or abrogate whatever sovereignty the Tribe may possess. As for the judicial doctrine of sovereign immunity, the Supreme Court defers to recommendations by the State Department with respect to the immunity which should be enjoyed by a foreign nation in our courts. *Republic of China, supra,* 348 U.S. at 360, 75 S.Ct. at 426. Further, the sovereign immunity of a foreign nation rests upon considerations of foreign diplomacy. 348 U.S. at 361, 75 S.Ct. at 427. But with respect to the sovereign immunity of Indian tribes, the Supreme Court recognizes that their immunity is the immunity of the United States. *United States v. United States Fidelity & Guaranty Co., supra.*

Whereas in the *Republic of China* case, the State Department had recommended that China not be immune from suit, the Department of Interior, which oversees Indian affairs, does not even have the power to make such a recommendation. Only Congress has power to waive the sovereign immunity of the Tribe, by statute. Further, no precedent, controlling or otherwise, has held that an analogy can or should be made between the sovereignty of tribal and foreign governments.

In accordance with the above discussion, all the Tribe's motions to dismiss counterclaims and amended counterclaims will be granted. The Court's previous order of May 9, 1978, denying the Tribe's original motion to dismiss will be vacated and substituted by the order to be filed in accordance with this Opinion. Final judgment will be rendered immediately.